NOT DESIGNATED FOR PUBLICATION

No. 116,623

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

JOHN GALENTINE,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed April 28, 2017. Affirmed.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Sam S. Kepfield*, of Hutchinson, for appellee.

Before ARNOLD-BURGER, C.J., BUSER and POWELL, JJ.

*Per Curiam*: A few days after U.S. Marshals arrested John Galentine and his roommate, the Buhler, Kansas, police chief entered Galentine's rental home at the invitation of the landlord without a search warrant or Galentine's consent. Using information gathered during that initial entry, the police chief obtained a warrant and conducted a more thorough search of the rental house. After seizing evidence of marijuana cultivation, the State charged Galentine with multiple drug crimes. Galentine moved to suppress the evidence, arguing the police chief's initial entry into the rental house violated his constitutional rights. The district court agreed and suppressed the

evidence. The State now seeks interlocutory review of the district court's order, arguing it erred in suppressing the evidence. Finding no error by the district court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Another panel of our court has already decided this identical matter in *State v. Conners*, No. 115,605, 2016 WL 7430331 (Kan. App. 2016) (unpublished opinion). Darla Conners, the defendant in the prior case, and Galentine were roommates.

On January 31, 2014, U.S. Marshals, accompanied by Buhler Police Chief William Tracy, arrested Galentine and Conners at their rental home in Buhler, a small community near Hutchinson. The couple was to be held for subsequent extradition to Pennsylvania.

"Within a few days, Lewayne Bartell, the rental house's owner, heard a rumor that U.S. [Marshals] had arrested Conners and Galentine at the rental house, and on February 3, 2014, he went to the house to determine whether anyone still lived there. On arrival, Bartell approached the rental house's front door and knocked on it. When he did not receive any response, he walked around the house to the backyard, where he saw a pile of leaves, bags, and trash. At that moment, he did not know the leaves were marijuana as Bartell did not open the trash bags or go through them. Although he expected tenants to keep the backyard cleaner, Bartell did not find the yard's contents unusual or a reason to call the police.

"Without obtaining permission from either Conners or Galentine, Bartell then entered the rental house through the front door, which was unlocked. Once inside, Bartell walked through the house and noticed it was still furnished and did not appear vacant. In the basement, he discovered what appeared to have been a greenhouse. Bartell found several plants, which he believed were marijuana, and paper pots where the plants had been grown. Bartell then exited the house and returned to the backyard. This time, he

2

opened one of the trash bags and found marijuana. After leaving the rental house, Bartell phoned Tracy and asked him to come check out the flowers growing in the basement.

"When Tracy arrived, he walked around the outside of the rental house. In the backyard, he found 10 to 15 trash bags against the back of the house. Some of the bags were open, so he looked inside one and saw marijuana leaves. Tracy then entered the house and went directly to the basement. There, he found lights hanging from the ceiling, a ventilation system, pots, and several plants lying on the floor. At that point, Tracy locked the house and left. Before leaving, Tracy moved one or two of the trash bags containing marijuana from the backyard and set them inside the back door. He also taped the doors with evidence tape.

"Based on this information, Tracy obtained a search warrant the next day. On the day after that, he and two drug task force agents conducted a search of the rental house. They seized 131 stems grown in potting media, two large black plastic bags containing green leafy vegetation, 1000-watt light bulb boxes, a power vent connected to the chimney, clonnex rooting compound, calendars with days marked on them, and mailing address labels showing Galentine resided at the rental house." *Conners*, 2016 WL 7430331, at *1-2.

The State subsequently charged Galentine with cultivation of marijuana and possession of drug paraphernalia with intent to distribute a controlled substance for sale. Galentine moved to suppress the evidence seized from the rental house, arguing Tracy conducted an illegal search in violation of his constitutional rights. He contended Bartell lacked authority to consent to Tracy's warrantless entry into the home and further argued Bartell lacked authority to enter the home and was acting as a government agent. Galentine also asserted that no exception to the exclusionary rule supported the admission of the evidence.

The district court held a suppression hearing where the State offered the testimony of Bartell and Tracy. Galentine did not present any evidence, but the parties stipulated to the testimony that was previously given at the hearing on Conners' motion to suppress.

"Bartell explained he had been a landlord for 20 years and owned 14 properties in Buhler. He recalled Conners and Galentine began renting the house in June 2013 and described them as always very timely in paying their monthly rent. Bartell stated he left the doors unlocked after leaving the rental house and testified that he did not escort Tracy through the house. Bartell claimed he specifically told Tracy about the trash bags containing marijuana in the backyard. He also testified he told Tracy that somebody should come down there and take a look because there was stuff there they probably needed to see.

"Tracy testified he had been in law enforcement for 27 years. He explained that when executing the arrest warrants for Conners and Galentine, he and a U.S. Marshal entered the rental house through the front door while two other U.S. Marshals went to the back of the rental house. Tracy stated the U.S. Marshals did not alert him that bags of marijuana were in the house's backyard. Tracy further stated that at the time he entered the house and stood in its kitchen, he did not observe anything odd in the house.

"Tracy also testified that Bartell was present during his initial entry into the rental house. According to Tracy, they entered the house through the front door, using a key to unlock it. Before arriving at the rental house, Tracy did not suspect any illegal activity, and the trash bags containing marijuana were not visible from the house's front side. Tracy claimed Bartell did not tell him marijuana was present at the house, and he admitted that although he knew [Galentine] lived at the rental house, he did not obtain [Galentine's] consent before entering.

"At the conclusion of evidence, the State argued suppression of the evidence was improper because Bartell had authority to consent to Tracy's entry into the rental house and because the evidence of marijuana cultivation was in plain view. Alternatively, the State asserted [Galentine] did not have a reasonable expectation of privacy in the house as a result of [his and Conners'] failure to timely pay February rent.

"Conversely, [Galentine] maintained [he] had a reasonable expectation of privacy in the curtilage adjacent to the rental house, highlighting Tracy's testimony that he was unable to see any contraband from the public roadway and only observed it on entry to the backyard. Furthermore, [he] argued Bartell did not have authority to consent to

4

Tracy's entry into the backyard or house and that no exigent circumstances existed to otherwise justify Tracy's warrantless entry." *Conners*, 2016 WL 7430331, at *2-3.

As it did in Conners' case, the district court granted Galentine's motion to suppress. In its written order, the district court made several factual findings, including:

- Galentine was current on rent.
- The rental home did not appear to have been abandoned and contained furnishings.
- Tracy had assisted the federal authorities in the arrest of Galentine and Conners.
- Bartell observed plants in the basement of the home and contacted Tracy and "told Tracy that he had observed flowers growing in the basement and a trash bag in the back yard that contained what he thought was marijuana."
- Tracy entered the home through an unlocked door and went through the home, including the basement.

Based on its factual findings, the district court concluded that Bartell, as the landlord, lacked both actual and apparent authority to consent to a search of the rental house. It concluded that Tracy had conducted a warrantless search of Galentine's home and the State had failed to demonstrate a valid exception to the warrant requirement.

The State timely appeals the district court's suppression order.

DID THE DISTRICT COURT ERR IN GRANTING GALENTINE'S MOTION TO SUPPRESS?

In this interlocutory appeal, the sole issue is whether the district court erred in granting Galentine's motion to suppress. When reviewing a district court's ruling on a motion to suppress, we apply a bifurcated standard of review. First, without reweighing

the evidence, we assess whether the district court's factual findings are supported by substantial competent evidence; then, we examine the district court's ultimate legal conclusions drawn from those facts, employing de novo review. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014) (quoting *State v. Karson*, 297 Kan. 634, 639, 304 P.3d 317 [2013]). "The State bears the burden to demonstrate a challenged search was lawful." *State v. Pettay*, 299 Kan. 763, 768, 326 P.3d 1039 (2014).

The State makes two principal arguments in opposition to the district court's suppression order. First, the State asserts that Galentine did not have a reasonable expectation of privacy in the rental house, meaning he lacks standing to challenge a search of the house. Second, even if Galentine has standing to challenge the search, the State contends the district court erred in applying the exclusionary rule to suppress the evidence because (1) law enforcement acted in good faith by merely responding to a request by the landlord and property owner to search the premises, (2) any evidence uncovered illegally at the time inevitably would have been discovered as the landlord and owner would have been lawfully entitled to enter the premises in a few days, and (3) the private search doctrine permitted the search of the home. We will examine the State's arguments in order.

A.    *Did Galentine have standing to challenge Tracy's warrantless entry into the rental house?*

The State contends that Galentine did not have a reasonable expectation of privacy in the rental house and raises a question of whether he has proper standing to challenge law enforcement's initial entry into the rental home. The panel in *Conners* addressed this exact issue.

6

"A criminal defendant must have standing to challenge a search or seizure, and the burden is on the defendant to show an expectation of privacy in the property searched. *State v. Talkington*, 301 Kan. 453, 476, 345 P.3d 258 (2015).

"The Kansas Supreme Court has explained that the courts have used the reasonable expectations test, as articulated in *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring), to determine whether a defendant has standing to challenge a search or seizure. *Talkington*, 301 Kan. at 461-62. '[A] search . . . occurs under the Fourth Amendment when: (1) the government obtains information by physically intruding on a constitutionally protected area, *i.e.*, persons, houses, papers, or effects, [citation omitted]; or (2) invades "'a subjective expectation of privacy that society recognizes as reasonable."'' 301 Kan. at 462. '[T]he United States Supreme Court [has subsequently] clarified that a traditional property rights baseline should be applied to Fourth Amendment cases as well.' 301 Kan. at 462; see *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409, 1417, 185 L. Ed. 2d 495 (2013).

"As the resident of a dwelling that is akin to a traditional home, a tenant possesses a reasonable expectation of privacy throughout the interior of a leased single-family house. See *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) ('[T]he Fourth Amendment has drawn a firm line at the entrance to the house.'). Further, the area "'immediately surrounding and associated with the home"' is the curtilage and is considered "'part of the home itself for Fourth Amendment purposes."' *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 [1984]). 'It harbors the intimate activity associated with the sanctity of a person's home and the privacies of life.' *State v. Fisher*, 283 Kan. 272, Syl. ¶ 1, 154 P.3d 455 (2007).

"The State does not contend that Conners, under normal circumstances, did not have a reasonable expectation of privacy in the rental house and its curtilage. Rather, the State's argument is that because Conners and Galentine had not paid rent for the month of February at the time of Tracy's initial entry and were incarcerated, Conners had a diminished expectation of privacy in the rental house. We disagree.

7

"Contrary to the State's argument, a reasonable person could have concluded based on the evidence that Conners was current on rent. At the suppression hearing, Bartell initially testified that Conners and Galentines' lease agreement required them to pay rent by the first of each month. Bartell then discussed their payment history, which showed they paid rent between the 5th and 9th of each month. Despite the express language of the lease agreement, Bartell considered their payments timely. Although Conners and Galentine had not paid February's rent when Tracy initially entered the rental house on February 3, they were not yet untimely in paying.

"Moreover, there is insufficient evidence to support the proposition that Bartell had retaken possession of the property. There is no evidence in the record that indicates Bartell had initiated any eviction proceedings or otherwise demonstrated an intention to retake possession of the rental property. Also, as Conners' counsel pointed out to the district court, Kansas' landlord-tenant act only considers a tenancy abandoned once the tenant has been in default for nonpayment of rent for 10 days and has removed a substantial portion of his or her belongings. See K.S.A. 58-2565(b). Bartell testified at the suppression hearing that the rental house was not vacant and Conners had not been in default for nonpayment of rent for 10 days at the time Tracy entered the home. Therefore, substantial competent evidence supports the district court's factual finding that Conners was still current on rent and had not yet abandoned the property.

"Having determined that substantial competent evidence supports a finding that Conners was a current tenant of the rental house, it becomes clear that she had a reasonable expectation of privacy in the rental house. See *Pennsylvania v. Strickland*, 457 Pa. 631, 637, 326 A.2d 379 (1974) (finding defendant's absence due to arrest and incarceration is not 'a sufficient basis upon which to conclude that the accused has abandoned any reasonable expectation of privacy in his home'). Thus, Conners had standing to challenge Tracy's initial entry and search of the rental house." 2016 WL 7430331, at *3-4.

We agree with this reasoning and hold that substantial competent evidence supports a finding that Galentine was a current tenant of the rental house and, thus, had a reasonable expectation of privacy in the rental house. See *Pennsylvania v. Strickland*, 457

8

Pa. 631, 637, 326 A.2d 379 (1974) (finding defendant's absence due to arrest and incarceration is not "a sufficient basis upon which to conclude that the accused has abandoned any reasonable expectation of privacy in his home"). Therefore, Galentine had standing to challenge Tracy's initial entry and search of the rental home.

B.    *Did the district court properly apply the exclusionary rule?*

Next the State argues that the district court should not have applied the exclusionary rule. Specifically, the State argues that two exceptions to the exclusionary rule—good faith and inevitable discovery—are applicable here. The State also argues that the private search doctrine allows for the admission of the evidence.

1.    *Good Faith*

The exclusionary rule is "a judicially created remedy [which] exists to prevent the use of unconstitutionally obtained evidence in a criminal proceeding against the victim of the illegal search" and is to deter law enforcement from violating a person's constitutional rights. *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010), *cert. denied* 563 U.S. 945 (2011). Because the exclusionary rule's primary purpose is deterrence, the law recognizes two exceptions to the rule based on a law enforcement officer's good-faith conduct.

First, the exclusionary rule should not be applied to "bar the use of 'evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause.'" *State v. Powell*, 299 Kan. 690, 700, 325 P.3d 1162 (2014) (quoting *United States v. Leon*, 468 U.S. 897, 900, 104 S. Ct. 3405, 82 L. Ed. 2d 677, *reh. denied* 468 U.S. 1250 (1984). Second, the exclusionary rule should not be applied to bar the use of evidence obtained by officers acting in reasonable reliance on a statute which is later found to be

9

unconstitutional. See *Daniel*, 291 Kan. at 498. Facially, the State's argument appears faulty because Tracy did not rely on a search warrant or any specific statute when initially entering Galentine's rental home.

The State's real argument appears to be that Tracy, in good faith, relied upon Bartell's request that he come look inside the home because Bartell had the apparent authority to authorize a search. Typically, "[a] landlord may not validly consent to a search of a tenant's residence." *State v. Loftin*, 276 S.C. 48, 50, 275 S.E.2d 575 (1981). However, Kansas has adopted the "'apparent authority' rule, which makes valid a consent to search when the facts available to an officer would warrant a person of reasonable caution to believe the consenting party had authority over the premises to be searched." *State v. Ratley*, 16 Kan. App. 2d 589, 595, 827 P.2d 78 (1992).

The district court found that Tracy knew Galentine had been arrested only 3 days before Bartell called him and that Tracy, who had the same opportunity as Bartell to observe all the furniture still in the house, would have been able to see that the rental home clearly was still occupied by Galentine. Moreover, the district court indicated that Tracy offered no explanation why he thought he had the right to search the premises without a warrant. Based on the district court's findings, we hold a reasonable person would not have concluded that Bartell had the apparent authority to authorize a search.

2. *Inevitable Discovery*

The State also asserts that the exclusionary rule should not have been invoked because the evidence would have been inevitably discovered. The panel in *Conners* addressed the issue of inevitable discovery.

"As a final point, the State contends law enforcement would have inevitably discovered the evidence suppressed by the district court. The State argues Conners would

10

have relinquished any privacy right in the rental house within 1 week of Tracy's initial entry, at which point the evidence still would have been inside the house, and law enforcement would have lawfully seized it, presumably by entering with Bartell's consent.

"If the prosecution can establish by a preponderance of the evidence that otherwise unlawfully obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible under the inevitable discovery doctrine. *Nix v. Williams*, 467 U.S. 431, 444-47, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984) (adopting doctrine in context of Sixth Amendment violation and noting comparable considerations in applying inevitable discovery to Fourth Amendment violations); *State v. Ingram*, 279 Kan. 745, 750, 113 P.3d 228 (2005) (doctrine applied to Fourth Amendment violation). The State has the burden to 'demonstrate ultimate admissibility.' *State v. Stowell*, 286 Kan. 163, 166, 182 P.3d 1214 (2008). Importantly, 'inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.' *Nix*, 467 U.S. at 444 n.5. '[T]he inevitable discovery exception does not invite speculation about the possible series of events under which the evidence may have been discovered, but requires an affirmative showing of a reasonable probability that the evidence would inevitably be discovered through lawful means already initiated when the seizure was made.' *State v. Mollett*, No. 97,999, 2008 WL 3852167, at *12 (Kan. App. 2008) (unpublished opinion), *rev. denied* 287 Kan. 768 (2009).

"Conners contends the State failed to meet its burden to establish that the evidence would have been inevitably discovered, regardless of the illegal search. She highlights that no evidence showed the seized evidence would have remained in the residence after her arrest, asserting that she could have had others remove the evidence from the house after her arrest. Conners also concludes that the State's argument that the police would have inevitably discovered the evidence through lawful means is a mere supposition.

"As already established, substantial competent evidence supports the district court's factual finding that Conners was current on rent. Thus, a conclusion that Conners had relinquished any privacy right in the rental house is contrary to the evidence and

11

would require us to engage in improper reweighing of the evidence. See *Neighbors*, 299 Kan. at 240. Substantial competent evidence also supports the district court's factual finding that Bartell told Tracy only that flowers were growing in the basement. Without further information of illegal activity, any application for a search warrant would have been denied for lacking probable cause. In light of the district court's factual findings, it appears the State failed to present evidence to support application of the inevitable discovery exception. The district court did not err in granting Conners' motion to suppress." *Conners*, No. 115,605, 2016 WL 7430331, at *5.

Here, the State relies on a portion of K.S.A. 58-2557, part of the Kansas residential landlord and tenant act (K.S.A. 58-2540 *et seq.*), in support of its argument that the evidence would have been inevitably discovered because Bartell, as the landlord, had the right to enter without Galentine's consent. The relevant sections of K.S.A. 58-2557 state:

"(a) The landlord shall have the right to enter the dwelling unit at reasonable hours, after reasonable notice to the tenant, in order to inspect the premises, make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen or contractors.

"(b) The landlord may enter the dwelling unit without consent of the tenant in case of an extreme hazard involving the potential loss of life or severe property damage."

At the hearing Bartell testified that he would have had to enter the home at some point because "[y]ou didn't know whether there was pets in there or whether the house had water running in it or, you know, you just didn't know." We are unpersuaded by this argument because there is no evidence that any extreme hazard existed to warrant Bartell's entry into the house. See *State v. Foster*, No. 113,883, 2016 WL 4500953, at *5 (Kan. App. 2016) (unpublished opinion) (holding without evidence of extreme hazard K.S.A. 58-2557 does not give landlord authority to enter tenant's space), *petition for rev.*

12

*filed* September 26, 2016. In Galentine's case, like in *Foster*, it is merely hypothetical that there was an extreme hazard. Without Bartell having actual knowledge of any extreme hazard, he is not authorized to just enter the rental house without first giving notice to the tenants as prescribed in K.S.A. 58-2557(a). The State did not meet its burden to show that the evidence would have been inevitably discovered; therefore, the district court did not err in applying the exclusionary rule.

### 3. *Private Search Doctrine*

Finally, the State argues that Tracy's search did not exceed the scope of Bartell's search and, therefore, under the private search doctrine, the evidence should not have been suppressed. In support of this argument, the State cites two federal cases: *United States v. Lichtenberger*, 786 F.3d 478 (6th Cir. 2015), and *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015).

The United States Supreme Court articulated the private search doctrine in *United States v. Jacobsen*, 466 U.S. 109, 124-26, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984), a case that involved the private search of a package first by Federal Express employees and then by federal agents. In that case, the Court stated that an initial search conducted by a private individual did not constitute a search that implicated the Fourth Amendment. 466 U.S. at 115. But the Court also held that once information obtained by a private search is turned over to law enforcement, law enforcement may not exceed the scope of the search "occasioned by private action" because an individual has a reasonable expectation of privacy in an area not open to a private search. 466 U.S. at 115-18. Here, the two cases relied upon by the State involve, like *Jacobsen*, a private individual's search of another's personal property. See *Lichtenberger*, 786 F.3d at 479 (evidence suppressed because scope of police search of laptop computer exceeded scope of private search); *Sparks*, 806 F.3d at 1329 (evidence from private search of cellphone not suppressed because defendant abandoned phone).

However, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 [1961]). Because of the heightened expectation of privacy one possesses in his or her home, the private search doctrine is inapplicable to the search of a private residence. See *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976) ("[T]he sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection."); *State v. Reno*, 260 Kan. 117, 128, 918 P.2d 1235 (1996) (quoting *State v. Platten*, 225 Kan. 764, 769, 594 P.2d 201 [1979]) ("'The Fourth Amendment protects a citizen's reasonable expectations of privacy and one's reasonable expectation of privacy in the home is entitled to unique sensitivity.'"); see also *United States v. Williams*, 354 F.3d 497, 510 (6th Cir. 2003) (holding private search doctrine not justified where landlord concerned about water leak entered rental unit, became suspicious of criminal activity, and called authorities, who walked through property with landlord and found marijuana); *United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997) ("*Jacobsen*, which measured the scope of a private search of a mail package, the entire contents of which were obvious, is distinguishable on its facts; this Court is unwilling to extend the holding in *Jacobsen* to cases involving private searches of residences.").

In the present case, Bartell's search, followed by Tracy's initial warrantless search, was not of a package, cellphone, or laptop, but of Galentine's home, making the private search doctrine inapplicable. The evidence derived from the search of Galentine's rental home was properly suppressed by the district court.

Affirmed.